RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DANIEL WOLLSCHLAGER,

> *Plaintiff-Appellant,*

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,

> *Defendant-Appellee.*

No. 20-1536

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:19-cv-10505—Victoria A. Roberts, District Judge.

Decided and Filed: March 31, 2021

Before: SUHRHEINRICH, SILER, and SUTTON, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** Mark S. Demorest, DEMOREST LAW FIRM, PLLC, Royal Oak, Michigan, for Appellant. John W. Guarisco, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee.

---

### OPINION

---

SUTTON, Circuit Judge. The State Bank in Fenton, Michigan faced financial challenges during the 2008 Great Recession. It hired Daniel Wollschlager, a banking executive and lending officer, to steady the ship. As an enticement, the Bank's holding company offered to pay Wollschlager roughly two years' salary if the Bank fired him prematurely—a golden parachute arrangement that Congress requires the Federal Deposit Insurance Corporation (FDIC) to approve when it comes to troubled banks. That risk materialized in 2011, when Wollschlager

and the Bank parted ways.  The Bank sought permission from the FDIC to pay Wollschlager the first installment of this money, roughly a year's salary.  The FDIC approved the request.  When the Bank later asked permission to pay the last installment, however, the FDIC declined on the ground that golden parachute arrangements should not exceed one year's salary, particularly for someone who had worked at the bank for just three years.  Wollschlager sued the agency, alleging that it violated the Administrative Procedure Act by refusing to permit the second payment.  The district court granted the FDIC's motion for judgment on the administrative record.  Because the FDIC's decision was neither arbitrary nor capricious, we affirm.

I.

A.

When companies hire executives, they sometimes promise to pay them a windfall if they are fired, the company becomes bankrupt, or the company is acquired.  To guard against excessive golden parachute payments by struggling financial institutions, Congress established limitations for the FDIC to implement.  12 U.S.C. § 1828(k).  It defined a "golden parachute payment" to include "any payment" made to employees that is "contingent on" their termination and made after the bank is determined to be "in a troubled condition."  *Id.* § 1828(k)(4)(A).  Under the statute, the FDIC may "prohibit or limit, by regulation or order, any golden parachute payment."  *Id.* § 1828(k)(1).

Congress gave the FDIC guideposts in exercising this authority.  *Id.* § 1828(k)(2).  The statute says that the agency should withhold golden parachute payments if the employee committed fraud, is responsible for the institution's troubles, or violated banking and finance laws.  *See id.* § 1828(k)(2)(A)–(D).  Apart from misconduct, the statute adds other factors for the agency to consider in deciding whether to approve a golden parachute payment, including whether the employee "was in a position of managerial or fiduciary responsibility," the "length of" the employment, and whether the "compensation involved represents a reasonable payment for" the employee's services.  *Id.* § 1828(k)(2)(E)–(F).  On top of that, Congress authorized the FDIC to "prescribe, by regulation," the details of these and other "factors to be considered."  *Id.* § 1828(k)(2).

After a notice and comment period, the FDIC announced final regulations implementing Congress's instructions. No troubled entity, the regulations say, may make a golden parachute payment unless it "obtains permission" from the agency. 12 C.F.R. § 303.244(a). If a covered company wants to make a payment, including agreements to make payments, it must submit a letter to the FDIC and receive its approval. *Id.* § 303.244(b).

The regulations generally bar a troubled financial entity from making a golden parachute payment. *Id.* § 359.2. But they carve out exceptions, two of which matter today. The first is a catchall, permitting payments if the "appropriate federal banking agency" and the FDIC find that the "payment or agreement is permissible." *Id.* § 359.4(a)(1).

The second exception, known as the white knight provision, takes on the problem of encouraging a talented banker to join a ship that may be sinking. It permits a troubled bank to agree to make a golden parachute payment if (a) the agreement is made when the bank faces solvency challenges or to "prevent it from imminently" becoming troubled, *id.* § 359.4(a)(2), and (b) the relevant banking agency (the Federal Reserve Bank in this instance) and the FDIC "consent in writing to the amount and terms of the golden parachute payment," *id.*; *see generally* FDIC, Guidance on Golden Parachute Applications, FIL-66-2010, at 9 (2010).

The regulations incorporate § 1828(k)(2)'s factors, including the employee's degree of responsibility, length of service, and whether the payments amount to reasonable compensation for the services performed. 12 C.F.R. § 359.4(b)(1)–(2). They add, for good measure, "[a]ny other factors or circumstances which would indicate that the proposed payment would be contrary to the intent" of the statute. *Id.* § 359.4(b)(3).

The FDIC has issued guidance about the scope of the exceptions. One matters here. It says that the first exception—the catchall provision requiring only consent—"should not be viewed as being intended to permit golden parachute payments in excess of 12 months' salary" for an employee. *See* FDIC, FIL-66-2010 at 8.

B.

The 2008 Great Recession was not good to the State Bank, a wholly owned subsidiary of Fentura Financial.  That October, the Bank sought Wollschlager's help to deal with "problem loans."  R.16-2 at 3.  Wollschlager and Fentura signed a retirement agreement providing a golden parachute worth $175,000 if the Bank fired him early.  A year later, in October 2009, the FDIC deemed the Bank to be in a "troubled" state.  R.16-7 at 3.

Two years into Wollschlager's tenure at the Bank, he negotiated a larger golden parachute.  Fentura and Wollschlager signed an amended retirement agreement in December of 2010, awarding him $245,000 if discharged early.  The new agreement "rescind[ed] and replace[d]" the original one.  *Id.* at 35.

Wollschlager's relationship with the Bank soured.  In September 2011, Fentura and Wollschlager signed a separation agreement providing that he would be paid his base compensation through the end of the year, roughly an additional $28,000.  The agreement also set forth how Wollschlager's $245,000 golden parachute payment would be made.  $138,000—equal to one year's salary—would be paid within 60 days of Wollschlager's departure.  The remaining $107,000 would be paid once the Bank's conditions improved, a prerequisite that also applied to the $28,000 separation payment.

Fentura did not seek the FDIC's approval before making these agreements.

A month before Wollschlager's departure, Fentura wrote to the FDIC and the Federal Reserve Bank seeking permission to pay Wollschlager the first $138,000 installment.  It acknowledged that payments under the amended retirement agreement "would constitute a golden parachute payment," as would the separation payment.  R.16-2 at 3.  And it realized that the FDIC's regulations "generally limit payments to no more than one year of annual salary."  *Id.* The Federal Reserve and the FDIC greenlighted the first payment.

After the Bank's condition improved in 2013, Fentura sought approval to pay the remainder:  $107,000 from the amended retirement agreement and $28,000 from the separation agreement.  As Fentura put the matter, it requested consent to "satisfy the terms of the"

retirement agreement "and the Separation Agreement." R.16-7 at 4. It "acknowledged" that the two agreements had "required prior approval pursuant to the Golden Parachute Restrictions" and that it had not met this condition. *Id.* at 5.

Although the Federal Reserve agreed to the second payment, the FDIC did not. Wollschlager, the FDIC reasoned, had already received a golden parachute payment equivalent to a full year's salary. Were Fentura to pay an additional $135,000, the total payment would be "almost two times" his annual salary, rendering it "inconsistent with" the agency's regulatory guidance. R.17-3 at 9. The FDIC also noted that Fentura "never submitted" its agreements with Wollschlager "for regulatory approval," *id.*, violating the rule that golden parachute agreements must receive the FDIC's consent, *see* 12 C.F.R. § 359.2. It added that the second payment of $135,000 would be "unreasonable given the Bank's troubled condition" as well as Wollschlager's "relatively short three-year employment at the Bank." R.17-4 at 4. With the second payment too large, Wollschlager's tenure too short, and the FDIC's preapproval nonexistent, the agency denied consent.

Wollschlager sued the FDIC, alleging that it acted unlawfully. The district court granted the FDIC's motion for judgment on the administrative record.

II.

Under the Administrative Procedure Act, we may "hold unlawful" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The initial choice over the right course of discretionary action is the agency's, not ours. A federal court should not "substitute its judgment for that of the agency" over matters that Congress has permissibly delegated to the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But an agency's judgment and exercise of discretion must turn on reasoned decision making. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The question at day's end is whether the agency reached a reasoned decision that accounted for the material considerations at hand. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). We review a district court's decision in this area with fresh eyes. *Glenn v. MetLife*, 461 F.3d 660, 665–66 (6th Cir. 2006).

The FDIC considered the relevant factors, fairly explained its reasoning, and reached a sensible judgment. Recall the factors the agency must assess. Did Wollschlager commit fraud, take actions putting the Bank in a troubled state, or violate banking laws? 12 C.F.R. § 359.4(a)(4). No: The FDIC found those factors favored Wollschlager, explaining that its "analysis and conversations with field examiners" concluded that "Wollschlager was not the cause of the bank's . . . problems." R.17-3 at 8.

Did Wollschlager have managerial responsibility? 12 C.F.R. § 359.4(b)(1). Yes: That factor helped Wollschlager, too, as he "was tasked with working through . . . problem assets, and by all accounts, was effective in this challenging role." R.17-3 at 8.

So far, these signs favor the payment.

But what about Wollschlager's length of employment and the reasonableness of the payment? 12 C.F.R. § 359.4(b)(3). No: These factors, the FDIC reasonably found, undermined the payment, as it would result in a windfall of two years' salary for an employee who worked for just three years. On top of that, the agency explained, the Bank never sought initial approval for the agreement.

These reasons stand on solid footing. As the Bank and Wollschlager already had reason to know, the FDIC's public guidance disapproves of golden parachute payments exceeding one year's salary. *See* FDIC, FIL-66-2010 at 8. And the FDIC requires approval of all payments by troubled entities, 12 C.F.R. § 303.244(a), which the statute tells us includes any payment "or any agreement to make any payment," 12 U.S.C. § 1828(k)(4). Fentura sought to pay Wollschlager almost twice the suggested cap and neglected to secure approval before signing any of its agreements with Wollschlager. Either fact by itself might offer the agency room to balk. Taken together, and considered alongside Wollschlager's brief tenure at the Bank, the FDIC provided "adequate reasons" for withholding consent, *Encino Motorcars*, 136 S. Ct. at 2125, after considering "the relevant factors," *Overton Park*, 401 U.S. at 416. All told, the agency did not act arbitrarily or (to the extent there is a difference) capriciously in refusing to sign off on the second payment to Wollschlager.

The only appellate case directly on point charts a similar course. After the FDIC refused to allow golden parachute payments exceeding 12 months' salary for some banking executives, BBX Capital sued the agency, insisting its decision was arbitrary and capricious. *BBX Capital v. Federal Deposit Ins. Corp.*, 956 F.3d 1304, 1311–12 (11th Cir. 2020) (per curiam). Disagreeing, the Eleventh Circuit emphasized the statutory default rule that "golden parachute payments are prohibited unless excepted." *Id.* at 1317. And it explained that the "FDIC's analysis of the discretionary factors" buttressed its finding. *Id.* Although the agency found that the executives had managerial responsibilities, it reasoned that they had been fairly compensated based on their tenure and cautioned that the leaders of troubled institutions should not "be awarded windfall payments." *Id.* at 1318 (quotation omitted). In the court's view, "the FDIC did exactly what it was supposed to do" in weighing the pertinent factors. *Id.* A similar outcome applies here.

## III.

Trying to head off this conclusion, Wollschlager insists that he is the kind of white knight contemplated by the regulations and that the FDIC failed to follow its own regulations in denying the second payment. The white knight provision, sure enough, is designed to entice people like Wollschlager to join troubled institutions. *See* FDIC, FIL-66-2010 at 9. But the exception imposes two straightforward requirements, and Wollschlager does not challenge the agency's authority to promulgate either one. A bank "may agree to make . . . a golden parachute payment if": (1) the "agreement is made in order to hire a person . . . when the insured depository institution" is troubled or is about to become troubled, and (2) the Federal Reserve Bank and the FDIC "consent in writing to the amount and terms of the golden parachute payment." 12 C.F.R. § 359.4(a)(2). Wollschlager did not satisfy the first condition and that suffices by itself to reject his challenge.

The first requirement establishes that the agreement must be made "in order to hire a person." *Id.* Fentura sought the FDIC's approval of the second golden parachute payment to "satisfy the terms of the" amended incentive agreement "and the Separation Agreement." R.16-7 at 4. The amended retirement agreement came about in December 2010—two years into Wollschlager's tenure—to provide "additional inducement" to keep him at the Bank. *Id.* at 3. As Wollschlager concedes, it was made in order to retain, not to hire, him. *See* Reply Br. at 5.

In its final rule, the FDIC refused to allow golden parachute payments to incentivize existing employees to stay at a troubled institution. In the agency's words, the white knight "rationale does not apply to the case of a current employee of a troubled institution since he/she does not need to be enticed to give up an established, stable career with another employer." 61 Fed. Reg. 5926, 5928 (1996). As for the separation agreement, it was signed in September 2011, just one month before Wollschlager departed the Bank. Fentura signed that agreement in order to fire Wollschlager, not "in order to hire" him. 12 C.F.R. § 359.4(a)(2).

Even so, Wollschlager counters, he and Fentura entered into the *original* incentive agreement so that he would join the Bank at a time when it faced challenges. Maybe so. But the amended incentive agreement "rescind[ed] and replace[d]" the original agreement between Fentura and Wollschlager. R.16-7 at 35. And Fentura sought the FDIC's consent only to "satisfy the terms of the" amended incentive agreement "and the Separation Agreement." *Id.* at 4. It never asked for the agency's approval to fulfill the terms of the original agreement between Wollschlager and Fentura. The relevant "agreement" before the agency was not made "in order to hire" Wollschlager. 12 C.F.R. § 359.4(a)(2). The agency did not act arbitrarily by opting not to consider a rescinded agreement.

Wollschlager separately argues that the FDIC acted arbitrarily by failing to consider the white knight provision's applicability. No doubt, had the FDIC explicitly addressed the white knight provision's relevance to this case, that would have facilitated review. But we uphold decisions "of less than ideal clarity" where the "agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight*, 419 U.S. 281, 286 (1974). Because the agency clearly articulated its reasons for denying the second payment, the administrative record provides ample grounds for our judgment that the agency did not act arbitrarily or capriciously.

But even if the FDIC erred in this respect, any error was harmless. The Administrative Procedure Act instructs us to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659–60 (2007). Remember that the same balancing factors the agency considered—an employee's position of authority, time spent at the entity, and whether a payment is reasonable given their services—applies to the white knight provision. *See* 12 C.F.R. § 359.4(b). And the white knight

provision's consent requirement mirrors the catchall consent exception. There is no reason to think the FDIC would change its mind by applying a different combination of the same words.

Last and least, Wollschlager contends that, because the FDIC approved the first golden parachute payment to Wollschlager, it "waived its argument that the agreements were never approved." Appellant's Br. at 31. Wollschlager is right that the agency (generously) overlooked Fentura's failure to obtain prior approval for the first $138,000 golden parachute payment. But he is wrong that the agency may not enforce that requirement now.

"Waiver is the intentional, voluntary relinquishment of a known right." *Am. Bank, FSB v. Cornerstone Cmty. Bank*, 733 F.3d 509, 615 (6th Cir. 2013). No "voluntary relinquishment" occurred. The FDIC faced a new application for a second golden parachute payment when Fentura returned for more, and it reasonably denied that request based on the regulations. It never gave up its authority to deny a later payment on grounds set forth in those regulations.

To the extent Wollschlager argues that the agency is estopped from changing its mind, that argument fails too. "An essential element of any estoppel is detrimental reliance on the adverse party's misrepresentations." *Lyng v. Payne*, 476 U.S. 926, 935 (1986). Wollschlager did not detrimentally rely on the FDIC's approval of the first golden parachute payment, nor did the FDIC misrepresent anything to anyone. That the FDIC overlooked the preapproval requirement when it allowed the first payment of $138,000 is a single act of grace it had no obligation to repeat.

We affirm.