# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 7, 2021         Decided July 5, 2022

No. 20-5314

F. SCOTT BAUER AND JEFFREY T. CLARK,
APPELLEES

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
APPELLANT

SOUTHERN COMMUNITY FINANCIAL CORPORATION, ET AL.,
APPELLEES

———

Consolidated with 20-5315, 20-5322

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-03047)

———

*Duncan N. Stevens*, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellant. With him on the briefs were *J. Scott Watson*, Senior Counsel, *Paul K. Sun*, *Jr.*, *Curtis J. Shipley*, and *Kelly Margolis Dagger*.

*Christopher T. Graebe* argued the cause and filed the briefs for appellees F. Scott Bauer and Jeffrey T. Clark.

*Adam L. Sorensen* argued the cause as *amicus curiae* in support of the District Court's Order. With him on the brief was *Joseph R. Palmore*, appointed by the court.

Before: MILLETT and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In the wake of a proposed merger, two high-level bank executives, F. Scott Bauer and Jeffrey T. Clark, were fired because they refused to accept a reduction in the amount of a payment that had been contractually provided for them if control of the bank changed hands. Bauer and Clark filed suit in state court against the bank that terminated them, as well as the bank with which it had merged. They alleged that they were legally entitled to the full change-in-control payments set out in their original employment agreements and other relief.

The banks turned to the Federal Deposit Insurance Corporation ("FDIC") for guidance as to whether any payments made to Bauer and Clark in the state court litigation would constitute statutorily restricted "golden parachute payment[s]," 12 C.F.R. § 359.2, and, if so, whether the FDIC would grant an exception to the general bar on such payments. After reviewing the parties' submissions, the FDIC responded that any such payments would constitute golden parachutes, and that it would not grant consent for them to be made.

Bauer and Clark then filed suit in federal district court, challenging the FDIC's determination as unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

Over the collective objection of the banks, Bauer, Clark, and the FDIC, the district court declined to reach the merits, instead holding that the FDIC lacked authority to render a golden parachute determination at all because the banks' application to the FDIC did not identify a specific proposed payment amount.

We reverse. Nothing in the relevant statute or regulations requires that the FDIC be presented with a precise dollar figure before it has the power to determine whether a proposed payment qualifies as a golden parachute payment. As for the language in the regulations on which the district court relied, stating that the application "shall contain * * * [t]he cost of the proposed payment[,]" that provision imposes a procedural requirement only on the applicant. 12 C.F.R. § 303.244(c)(4). It does not constrain the FDIC's authority to act. For those reasons, we reverse the district court's holding that the FDIC exceeded its authority in issuing its golden parachute determination, and remand for the district court to address the merits of Bauer's and Clark's APA claims.

# I

## A

Under the Federal Deposit Insurance Act, the FDIC regulates the activities of both "insured depository institution[s]," which are banks and savings associations with deposits insured by the Corporation, and "institution-affiliated part[ies]," which include the directors, officers, employees, and controlling shareholders of insured depository institutions. 12 U.S.C. § 1813(c)(2), (u)(1). The FDIC's responsibilities

include supervising and examining covered institutions to ensure financial stability and soundness. *See id.* §§ 1816–1818, 1822. If the FDIC finds that a bank is engaging in "unsafe or unsound" practices, the FDIC may issue a consent order under which it lays out remedial conditions that must be met and monitors the bank's compliance with those conditions. *Id.* § 1818(b).

One of the financial practices the FDIC closely superintends is the doling out of so-called "golden parachute payment[s]." 12 U.S.C. § 1828(k)(1). These are large payments promised in advance to executives in the event that they are fired or the company is acquired. *See Wollschlager v. FDIC*, 992 F.3d 574, 578 (6th Cir. 2021). Companies may promise golden parachute payments to entice sought-after executives or to ensure that those executives act in the best interests of the company even when doing so might put them out of a job (as in the case of a merger or takeover). But making good on those promised payments may put more financial stress on an already struggling institution or unjustly reward those who contributed to the financial woes of the institution.

The Federal Deposit Insurance Act expressly provides that the FDIC "may prohibit or limit, by regulation or order, any golden parachute payment[.]" 12 U.S.C. § 1828(k)(1). The Act's technical definition of "golden parachute payment" is:

> any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that—

(i)     is contingent on the termination of such party's affiliation with the institution or covered company; and

(ii)     is received on or after the date on which * * * the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition[.]

12 U.S.C. § 1828(k)(4)(A).

The FDIC's regulatory definition of "golden parachute payment" largely tracks that of the statute, though it adds that (1) the payment can be made by the insured depository institution itself or that institution's holding company, (2) the recipient can be either a former or current institution-affiliated party, (3) the payment can be contingent on, or by its terms payable on or after, the termination of the party's affiliation, and (4) the payment can be received on or after, or be made in contemplation of, the institution falling into a financially troubled condition. *Compare* 12 C.F.R. § 359.1(f), *with* 12 U.S.C. § 1828(k)(4)(A). The regulations also clarify that, to qualify as a golden parachute, the payment must be made to a party whose affiliation with the institution is terminated at a time when the institution is in a troubled condition. 12 C.F.R. § 359.1(f)(1)(iii).

The Act directs the FDIC to "prescribe, by regulation, the factors to be considered" in prohibiting or limiting golden parachute payments, adding that those factors "may include[,]" among other things, "[w]hether there is a reasonable basis to believe that the institution-affiliated party is substantially responsible for * * * the troubled condition of the depository institution[,]" and whether "the payment reasonably reflects

compensation earned over the period of employment[.]" 12 U.S.C. § 1828(k)(2)(B)(iii), (k)(2)(F)(i).

The FDIC's regulations generally prohibit golden parachute payments, stating that "[n]o insured depository institution * * * shall make or agree to make any golden parachute payment, except as provided in this part." 12 C.F.R. § 359.2. The regulations then identify four narrow exceptions to that prohibition. *See Id.* § 359.4(a). One exception is if the FDIC "determines that such a payment or agreement is permissible[.]" *Id.* § 359.4(a)(1). But for that exception to apply, the applicant seeking FDIC consent *must* "demonstrate that it does not possess and is not aware of any information" indicating "a reasonable basis to believe, at the time such payment is proposed to be made," that the anticipated recipient of the payment "is substantially responsible for * * * the troubled condition" of the institution. *Id.* § 359.4(a)(4).

The regulations also provide that, in determining whether to make an exception, the FDIC "*may* consider: (1) [w]hether, and to what degree, the [recipient] was in a position of managerial or fiduciary responsibility; (2) [t]he length of time the [recipient] was affiliated with the [financial institution], and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment; and (3) [a]ny other factors or circumstances which would indicate that the proposed payment would be contrary to the intent" of the statute or regulations. 12 C.F.R. § 359.4(b) (emphasis added).

Any entity seeking the FDIC's consent to a golden parachute payment must submit an application to the appropriate FDIC regional director. 12 C.F.R. § 303.244(b). That application "shall contain[:]"

(1) The reasons why the applicant seeks to make the payment;

(2) An identification of the institution-affiliated party who will receive the payment;

(3) A copy of any contract or agreement regarding the subject matter of the filing;

(4) The cost of the proposed payment and its impact on the institution's capital and earnings;

(5) The reasons why the consent to the payment should be granted; and

(6) Certification and documentation as to each of the points cited in § 359.4(a)(4) [including that the recipient of the payment is not substantially responsible for the troubled condition of the institution].

*Id.* § 303.244(c).

**B**

**1**

Bauer and Clark were senior executives at Southern Community Bank and Trust and the bank's holding company, Southern Community Financial Corporation (collectively, "Southern Community"). Bauer founded the bank and was its Chief Executive Officer and Chairman of the Board of Directors. Clark joined the bank in its first year and served in the roles of President and Chief Commercial Banking Officer.

In 2006 and 2007, Bauer and Clark entered into a series of employment agreements with Southern Community. Under the agreements, Southern Community had the right to

terminate Bauer and Clark without cause as long as it provided 60 days' notice. If they were terminated without cause, Bauer and Clark would be entitled to their most recent base salary for the unexpired term of the employment agreement. But if a change in control of Southern Community occurred during the term of the employment agreement, such as through a merger, Bauer and Clark would be entitled to a lump-sum cash payment equal to three times their annual compensation. The estimated total amount of these change-in-control payments was $4,869,087 for Bauer and $2,588,444 for Clark.

The employment agreements specified that they would "be binding upon * * * any successor" to Southern Community, and that Southern Community would "require any successor * * * to expressly assume and agree to perform [the employment agreements] in the same manner and to the same extent [Southern Community] would be required to perform if no such succession had occurred." Joint Appendix ("J.A.") 154; *accord* J.A. 206.

During the Great Recession of 2007–2009, Southern Community began to experience financial difficulties, and in 2011, it entered into a consent order with the FDIC, giving the agency supervisory authority over it. As part of the consent order, Southern Community was deemed to be in a "troubled condition" under the Federal Deposit Insurance Act and its implementing regulations.

The consent order required Southern Community to maintain a certain amount of capital on hand, to prepare a written plan to improve its financial condition, and to send regular progress reports to the FDIC and other regulators. It also required Southern Community's Board of Directors to increase its supervision of the bank and hire an independent

third party to review and produce a report on the bank's management and practices.

The external reviewer hired by Southern Community subsequently concluded that deficiencies in Bauer's and Clark's management styles and performance had contributed to the bank's financial troubles. The review recommended that they be assigned to positions of lesser responsibility.

In March 2012, Southern Community entered into a merger agreement with Capital Bank. One of Capital Bank's merger conditions required certain employees, including Bauer and Clark, to enter into amended employment agreements. The amended agreements would have substantially reduced the amount of the change-in-control payments to which Bauer and Clark were entitled. Bauer and Clark refused to sign the amended agreements. Southern Community then issued notices of termination without cause to Bauer and Clark, effective September 22, 2012. The merger between Southern Community and Capital Bank closed on October 1, 2012.

**2**

In November 2014, Bauer and Clark filed suit against Southern Community and Capital Bank in North Carolina state court, alleging breach of contract, tortious interference with contract and prospective economic advantage, and unfair and deceptive trade practices. *Bauer v. Southern Cmty. Fin. Corp.*, No. 14-CVS-7208 (N.C. Super. Ct. Feb. 11, 2016). They alleged that Southern Community had breached its contractual obligation to ensure that its successor assume and agree to perform the terms of their original employment agreements, including the obligation to provide the full change-in-control payments. They also asserted that, but for Capital Bank's tortious interference in requiring them to sign the amended employment agreements, they would have been retained as

employees of the new merged entity and continued to receive compensation and benefits. Bauer and Clark sought judgment against the banks "in an amount to be determined at trial," treble damages under North Carolina's unfair and deceptive trade practices law, and attorneys' fees. J.A. 133.

After the banks' motion to dismiss was denied, they sought guidance from the FDIC as to whether the monetary relief sought by Bauer and Clark in the lawsuit would constitute a prohibited golden parachute. In September 2016, the banks submitted a letter to the regional FDIC director with the subject line, "12 C.F.R. § 303.244 Application as to Golden Parachute Payments Sought by F. Scott Bauer and Jeffrey T. Clark[.]" J.A. 90. The letter stated that the banks were "unable to certify that [Bauer and Clark] had no substantial responsibility for the Bank's troubled condition[,]" as required by 12 C.F.R. § 359.4(a)(4) for a payment to receive FDIC approval. J.A. 96. They also asked whether the FDIC would consent to the banks making such payments even though they were unable to provide the required certification.

In response, Bauer and Clark filed their own letter with the FDIC, arguing that the prohibition on golden parachutes was not implicated in their lawsuit because any relief they could receive would be paid post-merger by Capital Bank, a non-troubled financial institution. They asked that the FDIC issue a determination making clear that the relevant statute and regulations would "not preclude Capital Bank from settling or paying a judgment" in the state court action. J.A. 655.

In June 2017, the FDIC issued its decision, concluding that "[t]he change-in-control payments sought in the [s]tate [c]ourt [a]ction * * * meet the golden parachute payment definition" in the FDIC regulations. J.A. 812. The agency reasoned that: (1) "Bauer and Clark are [institution-affiliated parties] of

[Southern Community]"; (2) "[t]he change-in-control payments sought * * * arise directly from the [employment agreements] and under their terms would have been paid to Bauer and Clark at or following their termination"; and (3) Southern Community "terminated Bauer['s] and Clark's employment * * * at a time when [it was] in [a] troubled condition." J.A. 812. The FDIC determined that not only would the change-in-control payments sought in Bauer's and Clark's breach-of-contract claim constitute golden parachutes, so too would any recovery based on Bauer's and Clark's tort claims and any attorneys' fees. It explained that such relief would constitute a benefit to Bauer and Clark arising out of the same set of facts as the contract claims directly seeking change-in-control payments.

The FDIC rejected Bauer's and Clark's argument that the change-in-control payments would not be golden parachutes because they would be paid by non-troubled Capital Bank. The FDIC noted that it "has consistently maintained that golden parachute payments by a healthy acquirer are subject to the Golden Parachute Rules to prevent [institution-affiliated parties] from circumventing the golden parachute regulation as a result of the timing or the structure of a purchase by a healthy acquirer." J.A. 813.

Next, the FDIC said that it would not consent to payment of the golden parachutes because the banks did not certify that Bauer and Clark were not substantially responsible for Southern Community's troubled condition. The FDIC explained that this "lack of appropriate certifications independently warrants denial of the applications[.]" J.A. 813. The FDIC also determined that, based on the available information, the banks could not have provided such a certification because Bauer and Clark were in fact substantially responsible for Southern Community's troubled condition.

The agency noted that Bauer's and Clark's high-level executive positions and their "substantial managerial and fiduciary responsibility" put them "in a position to make decisions and policies regarding the [b]ank that directly contributed to [the bank's] troubled conditions." J.A. 814. "This factor alone would [also] independently support denial of the applications[,]" the FDIC concluded. J.A. 814. Consequently, the FDIC declared that it "could not concur in the payments to Bauer and Clark in any amount[,]" J.A. 816, and "denie[d] the application in its entirety," J.A. 809.

The state court litigation was then stayed to allow Bauer and Clark to challenge the FDIC's golden parachute determination in federal court.

**3**

Bauer and Clark brought an APA action in federal district court, challenging the FDIC's determination that any recovery they obtained in the state court litigation would be a prohibited golden parachute payment. *See Bauer v. FDIC*, 486 F. Supp. 3d 93, 97 (D.D.C. 2020). They made clear, however, that they were not challenging the FDIC's secondary, discretionary determination that it would not grant permission for the banks to make an otherwise prohibited payment. The FDIC moved for judgment on the administrative record, the banks moved for summary judgment, and Bauer and Clark cross-moved for summary judgment.

The district court then directed the parties to file supplemental briefs addressing a matter not raised by any party: "Whether the FDIC acted inconsistently with 12 C.F.R. § 303.244 by issuing a decision about hypothetical damages payments or settlement payments at issue in the ongoing North Carolina state court action." J.A. 9. The FDIC, the banks, Bauer, and Clark all agreed that the FDIC had acted in

accordance with its regulations in issuing a golden parachute determination despite the ongoing nature of the state court action and urged the court to review the merits of the FDIC's determination.

The district court disagreed. It held that the FDIC lacked authority to issue a final decision on the banks' golden parachute application because the decision was "based on hypothetical payments in ongoing litigation." *Bauer*, 486 F. Supp. 3d at 99–100. The court relied on 12 C.F.R. § 303.244, which states that an application for an FDIC determination "shall contain[,]" among other things, "[t]he cost of the proposed payment and its impact on the institution[.]" *Id.* § 303.244(c), (c)(4). The court reasoned that this language unambiguously requires that the applicant "put forward the planned, actual amount of the golden parachute[,]" and does not permit the FDIC "to make a final determination on a hypothetical payment that might be forthcoming from ongoing litigation." *Bauer*, 486 F. Supp. 3d at 100. The court added that without a proposed payment amount, "too much [would be] left unknown"—for example, which claims would be successful, how much Bauer and Clark would be entitled to in damages, and who would be responsible for paying the damages—"for the FDIC to make a proper exercise of its discretion[.]" *Id.* at 101 n.6.

The district court clarified that the FDIC is not "categorically prohibited from reviewing a request under [Section] 303.244 while underlying litigation is pending." *Bauer*, 486 F. Supp. 3d at 101 n.5. "But such a request would have to include the specific payment sought in the underlying litigation." *Id.* The court noted that, here, the parties could not agree on a specific proposed payment, or even a proposed payment range.

Based on its conclusion that the FDIC had acted outside of its authority, the district court vacated the FDIC's final determination as contrary to law. The court expressly declined to reach the merits of the FDIC's decision. Accordingly, Bauer's and Clark's motion for summary judgment was granted in part and denied in part, and both the FDIC's motion for judgment on the administrative record and the banks' motion for summary judgment were denied.

The FDIC, banks, Bauer, and Clark all appealed. While continuing to disagree about the merits, they uniformly agree that the district court was wrong to conclude that the FDIC exceeded its authority in issuing the golden parachute determination without knowing the exact amount of the proposed payment. This court consolidated the three appeals and appointed an *amicus curiae* to defend the district court's decision.[1]

## II

The district court exercised jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction under 28 U.S.C. § 1291.

We review the district court's adjudication of the parties' cross-motions for summary judgment *de novo*. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017). Likewise, purely legal questions of statutory and regulatory

---

[1] The court appointed Joseph R. Palmore as *amicus curiae* to argue in support of the district court's decision. He, along with co-counsel Adam L. Sorensen, have ably discharged that duty, and the court greatly appreciates their service.

interpretation are reviewed *de novo*. *United States v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002).[2]

## III

The FDIC's golden parachute decision came in two distinct steps. At Step One, the FDIC determined whether the proposed payments constitute golden parachutes within the statutory and regulatory definitions, and so are generally proscribed. *See* 12 C.F.R. § 359.2. At Step Two, the FDIC decided whether to nevertheless make a discretionary exception under the regulations and permit the payments. *See id.* § 359.4(a).[3]

The district court ruled that the FDIC lacked authority to act at all on the golden parachute application. That was legal error with respect to both Steps of the FDIC's decisional process.

---

[2] The FDIC contends that its interpretation of the Federal Deposit Insurance Act warrants *Chevron* deference. FDIC Opening Br. 41 n.15 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). *Amicus* counters that an interpretation implicit in a letter issued by a Deputy Regional Director in the course of an informal adjudication is not the type of authoritative agency position entitled to *Chevron* deference. *See Amicus* Br. 30–31. We need not address the applicability of *Chevron* deference because, employing the "traditional tools of statutory construction," the "intent of Congress" on "the precise question at issue * * * is clear." 467 U.S. at 842, 843 n.9.

[3] *See* Bauer and Clark Opening Br. 3–4 (laying out this two-step framework).

16

**A**

**1**

The Federal Deposit Insurance Act and its implementing regulations straightforwardly authorize the FDIC, upon request, to provide its views on whether certain payments would qualify as golden parachutes. Nothing conditions that authority on the parties' identification of a precise dollar amount for the payment.

The Act gives the FDIC general authority to "prohibit or limit * * * any golden parachute payment[.]" 12 U.S.C. § 1828(k)(1). A necessary predicate to exercising that authority is determining what counts as a golden parachute payment under the statute. *See id.* § 1828(k)(4)(A). Recall that a "golden parachute payment" is defined as (1) "any payment (or any agreement to make any payment) in the nature of compensation[,]" (2) by a depository institution "for the benefit of any institution-affiliated party[,]" (3) based on an obligation of the institution that "is contingent on the termination of such party's affiliation with the institution[,]" (4) that is "received on or after the date on which" the institution is determined to be in a "troubled condition[.]" *Id.* The statute's plain text does not require a predetermined amount of payment.

Neither does determining whether those four statutory elements are met require having a precise payment amount in hand. The FDIC, after all, can readily decide whether money exchanged as a result of a settlement or judgment would constitute a "payment" (a "direct or indirect transfer of any funds[,]" 12 U.S.C. § 1828(k)(5)(C)), "in the nature of compensation[,]" *id.* § 1828(k)(4)(A), without knowing how much money would be exchanged. Similarly, the amount of a proposed payment is completely irrelevant to determining whether that payment would be made by a depository

institution and "for the benefit" of an institution-affiliated party. *Id.* So too with the inquiry into whether the payment would be contingent on the termination of that party's affiliation with the institution. And certainly determining *when* the payment would be made—whether before, on, or after the date when the institution is deemed to be in a "troubled condition"—does not require knowing *how much* the payment would be. *Id.*

Consistent with the statute, FDIC regulations state that, as a general matter, no financial institution "shall make or agree to make *any* golden parachute payment[.]" 12 C.F.R. § 359.2 (emphasis added). The use of "any" highlights that the presumptive prohibition applies regardless of the payment amount.

The regulations also provide that otherwise-prohibited golden parachute payments can be made if the FDIC permits them. *See* 12 C.F.R. § 359.4. Those regulations would be meaningless unless the FDIC can police the boundaries of what counts as a golden parachute in the first place. And like the statutory definition, the regulatory definition of "golden parachute payment" makes no mention of the amount of payment, and its criteria do not depend on such a determination. *See* 12 C.F.R. § 359.1(f)(1) ("The term *golden parachute payment* means any payment (or any agreement to make any payment) in the nature of compensation * * * for the benefit of any current or former" institution-affiliated party that is "contingent on, or by its terms is payable on or after, the termination of [the recipient's] primary employment or affiliation with the institution[,]" if the payment "[i]s received on or after" the institution is in a troubled condition and the termination occurred while the institution was in a troubled condition.).

In this case, the FDIC found at Step One that the critical elements of the golden parachute definition were met: Bauer and Clark are former institution-affiliated parties who were terminated when Southern Community was in a troubled condition, and they are seeking payments tied to and payable after the termination of their affiliation with Southern Community. Having so concluded, the FDIC was able to determine that a payment from the banks to Bauer and Clark "in *any* amount" would constitute a golden parachute. J.A. 816 (emphasis added); *cf. Von Rohr v. Reliance Bank*, 826 F.3d 1046, 1049 (8th Cir. 2016) (Even though Von Rohr sought a specific amount in breach-of-contract damages, the FDIC determined that "*any* payments being sought by Von Rohr" from the bank "constitute[d] prohibited golden parachute payments[.]") (emphasis added).

The FDIC's answer would be the same regardless of whether the litigation resulted in a $1 or $1,000,000 payment to Bauer and Clark. So for the parties to spend years and countless resources litigating to a judgment that the FDIC can readily tell in advance will be a forbidden golden parachute, whatever the amount, would be a fool's errand.

**2**

In concluding that the FDIC lacks authority to opine on whether the proposed payment would be a golden parachute, the district court relied principally on 12 C.F.R. § 303.244's direction that the application seeking the FDIC's consent to a golden parachute payment "shall contain * * * [t]he cost of the proposed payment[.]" *Id.* § 303.244(c)(4); *see id.* § 303.244(c) (detailing the contents of an "application" for FDIC consideration). That regulation is doubly inapplicable in that (1) it governs what information the person seeking the FDIC's views must provide, not the actions of the FDIC itself, *see id.*

§ 303.244(b)–(c), and (2) it applies only to the Step Two discretionary determination by the FDIC, not the predicate Step One question of whether the payment constitutes a golden parachute in the first place.

To be fair to the district court, the banks themselves labeled their letter a "12 C.F.R. § 303.244 Application" for FDIC permission to make a Step Two golden parachute payment. They presumably did so because there is no parallel regulation providing instructions on how to obtain a Step One determination. *See generally* 12 C.F.R. Part 303 ("Filing Procedures"); *see also* Oral Arg. Tr. 6:7–15 ("Does the FDIC have a procedure for parties to come ask the [S]tep [O]ne question?" "Your Honor, there isn't a separate procedure.").

But that does not change the FDIC's legal authority to determine what qualifies as a golden parachute as part of its statutory responsibility to "prohibit or limit * * * any golden parachute payment[.]" 12 U.S.C. § 1828(k)(1). That authority, instead, is grounded squarely in the text of the Federal Deposit Insurance Act and its implementing regulations, which do not limit the FDIC's decisions to those payments for which a precise dollar amount has already been assigned.

**3**

Taking a different tack than the district court, *Amicus* argues that the statutory definition of the word "payment" forbids the FDIC to address the golden parachute status of potential monetary relief in litigation while that case is still pending. *Amicus* points out that Congress only authorized the FDIC to prohibit "golden parachute *payment*[*s*]," and that "payment" is defined in the statute as "any direct or indirect transfer of any funds or any asset[.]" *Amicus* Br. 23 (emphasis added) (quoting 12 U.S.C. § 1828(k)(5)(C)). "[U]ncertain claims in a contested lawsuit are not a 'payment' under the

statute[,]" *Amicus* argues, "because they do not necessarily involve a 'transfer' of funds or assets." *Amicus* Br. 23 (citation omitted). He adds that "[w]hile a settlement or judgment might entail such a 'transfer,' the mere possibility of liability does not." *Amicus* Br. 24.

Perhaps. But the FDIC did not decide that Bauer's and Clark's pending legal *claims* were golden parachute payments. Rather, it determined that if those pending legal claims were to give rise to a monetary payment—whether through a settlement or judgment— any such payment would be a golden parachute. Nothing in the statute forbids the FDIC from advising regulated parties whether a contemplated future payment would be a golden parachute if and when made. *See Tennessee Gas Pipeline Co. v. Federal Power Comm'n*, 606 F.2d 1373, 1380 (D.C. Cir. 1979) ("[A]gencies are generally free to act in advisory * * * capacities.").

Notably, the statute and regulations define golden parachutes in terms of "any payment" or "*agreement to make* any payment[.]" 12 U.S.C. § 1828(k)(4)(A) (emphasis added); *accord* 12 C.F.R. § 359.1(f)(1). The explicit inclusion of mere agreements to make payments in the definition reinforces the FDIC's authority to identify golden parachutes before any funds have actually changed hands and before the precise payment amount is known. In fact, employment agreements frequently peg payments to the executive's level of compensation at the time of termination, which may be unknown when the FDIC's approval for the agreement is sought. *See, e.g.*, *Wollschlager*, 992 F.3d at 578, 580 (separation payment tied to executive's "base compensation through the end of the year" and annual salary); *McCarron v. FDIC*, 111 F.3d 1089, 1092 (3d Cir. 1997) (agreement to pay executive "a lump sum severance payment in an amount equal to three times his annual salary").

**B**

The district court also held that the absence of an identified payment amount stripped the FDIC of authority to render its Step Two decision denying discretionary consent for the banks to make otherwise-prohibited golden parachute payments. Here too, the district court was mistaken.

While the regulatory provision cited by the district court, 12 C.F.R. § 303.244(c)(4), does govern the Step Two process, it does not constrain the FDIC's authority. As noted before, Section 303.244 only "contains the procedures *to file for* the FDIC's consent when such consent is necessary[.]" *Id.* § 303.244(a) (emphasis added). The rule explains that "[*a*]*pplicants shall submit* a letter application to the appropriate FDIC regional director[,]" and then lists the items that the "application" "shall contain[.]" *Id.* § 303.244(b)–(c) (emphasis added). One of those is the cost of the proposed payment. *Id.* § 303.244(c)(4). The burden to provide that information, like other required components of the application, falls on the party seeking the FDIC's consent. *See id.* § 303.244(c)(1), (5) (requiring application to contain "[t]he reasons why the applicant seeks to make the payment" and "[t]he reasons why the consent to the payment should be granted").

Beyond that, in analyzing the role of a regulation within the agency process, we distinguish between "procedural rules benefitting the agency" and "procedural rules benefitting the party otherwise left unprotected by agency rules[.]" *Lopez v. Federal Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003).

By its plain terms, Section 303.244 falls in the former category. It is a regulation "intended primarily to facilitate the development of relevant information for the Commission's use in deciding applications[.]" *American Farm Lines v. Black*

*Ball Freight Serv.*, 397 U.S. 532, 538 (1970). We will not invalidate agency action that departs from such agency-benefitting procedures unless the complaining party has shown "substantial prejudice[.]" *Lopez*, 318 F.3d at 247 (citing *American Farm Lines*, 397 U.S. at 539). Here, Bauer and Clark do not claim to have been prejudiced at all by the FDIC's failure to strictly enforce Section 303.244's application requirements, much less substantially prejudiced.

*Amicus* argues that the FDIC was not free to disregard a regulation requiring the collection of information that Congress and the agency itself have deemed to be critical in evaluating a golden parachute application at Step Two. *See* 12 C.F.R. § 359.6 ("For filing *requirements*, consult 12 [C.F.R.] [§] 303.244.") (emphasis added); 12 C.F.R. § 303.244(c) ("The application *shall* contain the * * * cost of the proposed payment[.]") (emphasis added).

We disagree. The statute and regulations treat the amount of the proposed payment as a factor the FDIC *may* consider, not an essential predicate to the agency's ability to act. The statute, for one, simply directs the agency to "prescribe, by regulation, the factors to be considered" in making golden parachute determinations, and then offers some suggestions for what those factors "may" include. 12 U.S.C. § 1828(k)(2). One of those potential factors is "the degree to which * * * the payment reasonably reflects compensation earned over the period of employment[,]" which is the closest the statute comes to possibly referencing a payment amount. *Id.* § 1828(k)(2)(F)(i).

Likewise, in its implementing regulations, the FDIC set out both mandatory and permissive factors to be considered in deciding whether to allow a golden parachute payment to be made. *See* 12 C.F.R. § 359.4. In the mandatory camp is the

requirement that the applicant "shall demonstrate that it does not possess and is not aware of any information * * * which would indicate that there is a reasonable basis to believe" that the institution-affiliated party is "substantially responsible" for the troubled condition of the institution. *Id.* § 359.4(a)(4).

In the permissive camp is "the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment[.]" 12 C.F.R. § 359.4(b)(2). Like its statutory counterpart, that provision at most implies that the payment amount is a factor that the FDIC "*may* consider" in evaluating a golden parachute application. *Id.* § 359.4(b) (emphasis added).

Proof in point of the permissive nature of that criteria is that the payment amount was entirely extraneous to the FDIC's reasons for denying consent in this case. The FDIC made its decision not to authorize the golden parachute payments to Bauer and Clark based on the banks' inability to satisfy a mandatory factor—namely, their inability to certify that Bauer and Clark were not substantially responsible for Southern Community's troubled condition. Because consent would run afoul of that mandatory criterion, there was no need for the FDIC even to address the permissive factors, including the reasonableness of the proposed payment amount. For that reason, the FDIC was well within its rights to deny the application despite the banks' failure to include "[t]he cost of the proposed payment" in their application. 12 C.F.R. § 303.244(c)(4).

**IV**

Having concluded that the district court erred in holding that the FDIC lacked authority to render its golden parachute determination, we decline to reach the merits of Bauer's and Clark's APA claims, and instead remand for the district court

to do so in the first instance. "[W]e are a court of review, not of first view[,]" *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (citation omitted), so where the merits went unaddressed below, it is "our general practice * * * to remand to the district court," *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014). We see no reason to depart from that general practice here.

For all of those reasons, we reverse the district court's order vacating the FDIC's final determination and remand for the district court to consider Bauer's and Clark's claims on the merits.

*So ordered*.